JUDGE FURMAN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 18 CV 9150

In the Matter of the Application of

SUSAN F AVERY,

Index Number

                           Plaintiff,

COMPLAINT

-against-

Trial By Jury Requested

Janet M DiFiore, Kay-Ann Denise Porter, Lauren Pamela DeSole,
NYS Unified Court System of the State of New York,
State of New York State, Lawrence Marks,
Unified Court System Office of Court Administration,
John McConnell, New York City, George J Silver,
Anthony Cannataro, Anne Katz, Cheryl J Gonzalez,
Jean Taylor Schneider, Miriam Breier, John Landsen
Gary Robert Connor, Barbara Zahler-Gringer
Ronald Paul Younkins, Housing Court Advisor Council
Members/appointees and Linda Dunlap Miller,

                         Defendants.

TO THE UNITED STATES FEDERAL COURT SOUTHERN DISTRICT OF NEW YORK

The complaint of the plaintiff, SUSAN F AVERY, respectfully shows to this court, as follows:

## BRIEF DESCRIPTION OF THE PARTIES LOCATIONS

1. Plaintiff resides at 332 East 84 Street, 6B, New York, NY 10028.

2. Defendants are below described and have business addresses as follows:   Janet M DiFiore, NYS Court of Appeals, 20 Eagle Street, Albany, NY 12207-1009 negligently and in disregard of the public trust and court employees rights, hires, promotes and retains employees

5

that violate the rights of others including those stated below, Kay-Ann Denise Porter, 25 Beaver

Street, New York, NY 10004-2310, Lauren Pamela DeSole, NYS Unified Court

System- Employee Relations Division, 25 Beaver Street, New York, NY 10004-2310, Lawrence

Marks, Unified Court System Office of Court Administration, 25 Beaver Street, New York, NY

10004-2310, John McConnell, Office of Court Administration, 25 Beaver Street, New York, NY

10004-2310, George J Silver, Supreme Court, New York County, 60 Centre Street, New York,

NY 10007-1402, Anthony Cannataro, Civil Court of the City of New York, 111 Centre Street,

New York, NY 10013-4390, Anne Katz, Civil Court of the City of New York. 111 Centre Street,

New York, NY 10013-4390, Cheryl J Gonzalez, Civil Court of the City of New York, 141

Livingston Street, Brooklyn, NY 11201-5120, Jean Taylor Schneider, Civil Court of the City of

New York, 111 Centre Street, New York, NY 10013-4390, Miriam Breier, Civil Court of the

City of New York, Bronx Housing Court, 1118 Grand Concourse, Bronx, NY 10456-3902, John

Landsen, Civil Court of the City of New York, 8917 Sutphin Boulevard, Jamaica, NY

11435-3710, GARY Robert CONNOR, Housing Court Advisory Council, 111 Centre Street,

New York, NY 10013, defendants, Barbara Zahler-Gringer, Kay-Ann Denise Porter and Lauren

Pamela DeSole, failed to properly investigate plaintiff's complaints as detailed below, and

therefore violated the public trust and facilitated the Inspector Generals complacency with

investigating and attempting to substantiate sexual harassment complaints and can be located at

NYS Unified Court System, 25 Beaver Street, New York, NY 10004-2310, Ronald Paul

Younkins, NYS Unified Court System, 25 Beaver Street, New York, NY 10004-2310, Linda

Dunlap Miller, Housing Court Advisory Council, 111 Centre Street, Room 1240, New York, NY

10013.

## BRIEF DESCRIPTION OF THE PARTIES

3. Plaintiff was employed at New York State, in the division of the Unified Court System since on or about August of 1999.

4. Most recently plaintiff was so employed by the State of New York as a Housing Court Judge, having been appointed to a five (5) year term to commence on October 11, 2011.

5. *Inter alia*, defendant, Janet M DiFiore, is the Chief Judge of the Highest Court of the State of New York, and has supervisory authority over all New Yor State Court Operations; defendant, Kay-Ann Denise Porter, is an attorney employed at the New York State Office of Court Administration and is responsible to investigate not misinvestgate and cover-up allegations against court employees, including Judges; defendant, Lauren Pamela DeSole, is an attorney employed at the New York State Office of Court Administration and is responsible to investigate not misinvestgate and cover-up allegations against court employees, including Judge; defendant, NYS Unified Court System- Employee Relations Division, defendant, Unified Court System Office of Court Administration, and NYS Unified Court System, New York State, is the the judiciary of New York (and officially referred to as the New York State Unified Court System) it is the judicial branch of the Government of New York, comprising all the courts of the State of New York (excluding extrajudicial administrative courts); (f) defendant, Lawrence Marks, has been the appointed Chief Administrative Judge of the Courts of New York State. Since 2015, he is employed in a position of public trust, which he failed to live up to; defendant George J Silver, by Chief Administrative Judge Lawrence K. Marks, to the position of Deputy Chief Administrative Judge for the New York City Courts in July, 2017, he is employed in a position of public trust and confidence and required to honor confidentiality, which was not honored;

7

defendant, Anthony Cannataro, is an administrative Judge for the New York City Courts, and

was so titled prior to 2017, and is employed in a position of public trust and confidence and

required to honor confidentiality, which was not honored; defendant, John McConnell, is counsel

to the New York State Court System and defendant Marks; defendant, New York City, is the city

of New York; defendants, Anne Katz, Cheryl J Gonzalez, Miriam Breier, and John Landsen are

all Supervising Judges of the Housing Court, and according to defendant Marks, guided him in

his determination which violated the public trust which attaches to his position and

responsibilities; defendant, Jean Taylor Schneider, is the Supervising Judge of Housing Court

and according to defendant Marks, guided him in his determination which violated the public

trust which attaches to his position and responsibilities, and also inappropriately and tortuously

acted as stated below; defendant, GARY Robert CONNOR, is the Chair of the Housing Court

Advisory Council, and has been so for the relevant time, and as detailed below, acted in violation

of the trust of his position;

## BRIEF HISTORY

10. In a letter signed by respondent Marks and delivered by Housing Court Supervising

Jude Jean Schneider, on or about June 6, 2018, plaintiff was informed that respondent Marks

exercised his discretion and declined to reappoint plaintiff to another term on the Housing Court

Bench.

11. For reasons, including those stated below, this respondent's Marks' decision was

retaliatory, arbitrary, capricious, contrary to law and issued in violation of plaintiff's rights,

including, but not limited to her rights to complain and file complaints other employees, and in

violation of plaintiff's constitutional rights including her first amendment rights, human rights

8

laws as well as her rights which are protected under the whistle blower statute.

## THE LAW - RESPONDENT MARKS FAILED TO FOLLOW CIVIL COURT ACT

12. The Civil Court Act (CCA) at section 110, authorizes the creation of the Housing Part of the Civil Court.

13. The CCA provides the jurisdiction of the Housing Court, the manner in which Housing Court Judges are appointed and the manner in which Housing Court Judges are reappointed.

14. As the Housing Court and its appointment process and reappointment process are creatures of statute, the CCA as it applies to the Housing Court, must be strictly construed, indeed, "[t]he "starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof" *Chauca v Abraham,* 30 NY3d 325 (2017) *citing Matter of Shannon*, 25 NY3d 345 [2015]).

15. "It is a well-established principle of statutory construction that words of technical or special meaning are used by the legislature, ˙not loosely, but with regard for their established legal significance, and in construing a statute a technical meaning should be given to technical words, unless a contrary meaning is unmistakably intended'" *id citing* to *People v Wainwright,* 237 NY 407, 412 [1924]; and McKinney's Cons Laws of NY, Book 1, Statutes §233.

16. There is no legal requirement that the reappointment of a Housing Court Judge be based in any part, on the recommendation of the HCAC, rather, in enacting the applicable law, the legislature, specifically omitted this requirement.

17. Indeed, the CCA at section (I) reads as follows: "Reappointment [of a Housing Court Judge] shall be at the discretion of the administrative judge and on the bases of the performance,

9

competency and results achieved during the preceding term."

18. In his letter of non reappointment, respondent Marks stated that his decision was based on discussions with "the supervising judges of the Housing Court."  He gave no specifics as to specific recommendation of any of those Judges and failed to cite even one (1) example where plaintiff demonstrated a lack of performance, competence or a failure to achieve results (please note as a result of, *inter alia*, the unlawful search and seizure as detailed below, the plaintiff/petitioner is unable to provide this Honorable Court with a copy of this letter.

## PERFORMANCE, COMPETENCY AND RESULTS ACHIEVED

19. Defendant Marks failed to identify specifics regarding plaintiff's performance, competency and results achieved during the preceding term.   Indeed, as to performance, plaintiff was on the bench during the appointed hours that she was required (and as will be demonstrated, other Housing Court Judges are routinely cited for failing to take the bench on time, excessive absenteeism and participating in lunch hours which last in excess of an hour, yet they have been reappointed) and there were no complaints that the hours that she worked did not comply with court time and leave mandates.

20. Further, as to performance, in the six (6) years that she presided as a Housing Court Judge, plaintiff presided over hundreds of thousands of cases.   There were no complaints  from the public or the bar that she did not issue decisions timely or efficiently.   In fact, annexed hereto is a list of matters that could not be resolved and were submitted to Judge Avery for decision.   A review of said list shows that the decisions were timely.

21. Additionally, as to performance, as to the hundreds of thousands of decisions that Judge Avery issued, and of all the decisions that she issued that were appealed, all but one have

10

been affirmed, as listed below:

*SJS Thompson LLC v Singer*, 60 Misc3d 132(A) (App Term 1st Dept [ 2018])
unanimously affirmed
*Fountain Terrace Owners, Inc. v Balic*, 59 Misc3d 136(A) (App Term 2nd Dept [2018])
as modified, unanimously, affirmed
*Petros Realty Owners, LLC v Vetrano*, 59 Misc 3d 148(A) (App Term 2nd Dept [2018])
unanimously affirmed

22. Additionally, as to performance, in addition to the decisions that Judge Avery issued

that were unanimously affirmed as listed above, decisions issued by Judge Avery which have

been positively cited with favor by the Appellate Term First department, include, in dissent,

*Capital One Bank (USA) v Koralik,* 51 Misc3d 74 (App Term 1 Dept [2016]), which positively

cited plaintiff's decision *Intervale Ave Assoc v Donlad*, 38 Misc3d 1221[A] (Civ Ct Bronx

County [2013]); and cited twice her decision in *2132 Presidential Assets, LLC v Carrasquillo*, 39

Misc3d 756 (Civ Ct Bronx County [2013]).

23. Additionally, as to performance, see below list of decisions issued by plaintiff during

her first five (5) years on the bench.

24. As to competency, plaintiff respectfully refers this court to the decisions that Judge

Avery issued which have been affirmed and cited with favor, as cited above.

25. Further, as to competency, plaintiff respectfully refers this honorable court to the

articles that were authored by Judge Avery (see attached).

26. As to results, in her first five (5) years on the bench, decisions issued by plaintiff have

been published, as follows:

*104 Realty LLC v Brown*, 41 Misc3d 1228(A) (Civ Ct Kings County [2013])
*2 Perlman Dr., LLC v Stevens*, 54 Misc3d 1215(A) (Civ Ct Kings County [2017])
*2132 Presidential Assets, LLC v Carrasquillo*, 39 Misc3d 756 (Civ Ct Bronx County
[2013])

11

*308 Hull LLC v Castellani*, 39 Misc3d 1234   (Civ Ct Bronx County [2013])
*332 EDC Realty Corp. v Barlow*, 43 Misc3d 1207(A) (Civ Ct Kings County [2014])
*Ackerman v Berkowitz*, 54 Misc3d 867 (Civ Ct Kings County [2016])
*Bailey v Dixon*, 47 Misc3d 1225(A) (Civ Ct Kings County [2015])
*Citadel Estates*, LLC. v Pathways to Hous., Inc., 44 Misc3d 1222(A) (Civ Ct Kings
County [2014])
*Huggins v Randolph*, 45 Misc3d 521 (Civ Ct Kings County [2014])
*Intervale Ave Assoc v Donlad*, 38 Misc3d 1221 (Civ Ct Bronx County [2013])
*Jack Will, LLC v Edwards*, 42 Misc3d 1235(A) (Civ Ct Bronx County [2014])
*Kingston Hgts. Apts. v Hurdle*, 55 Misc3d 1211(A) (Civ Ct Kings County [2017])
*Matter of Brown*, 54 Misc3d 515 (Civ Ct Kings County [2016])
*Matter of Morataya*, 53 Misc3d 242 (Civ Ct Kings County [2016])
*Matter of Moreno*, 55 Misc3d 1206(A) (Civ Ct Kings County [2017])
*NYCHA Coney Is. Houses v Ramos*, 41 Misc3d 702 (Civ Ct Kings County [2013])
*North-Driggs Holdings, LLC v Burstiner*, 44 Misc3d 318 (Civ Ct Kings County [2014])
*Padernacht v Doe*, 38 Misc3d 825 (Civ Ct Bronx County [2012])
*Parkash v Almonte*, 41 Misc3d 267 (Civ Ct Bronx County [2013])
*Riverstone Assoc., LP v Campbell*, 57 Misc3d 380 (Civ Ct Kings County [2015])
*Steinmetz v Santiago*, 46 Misc3d 1225(A) (Civ Ct Kings County [2015])
*Stevenson Commons Assoc. v Vargas*, 36 Misc3d 1211(A) (Civ Ct Bronx County [2012])
*Tiffany Gardens, L.P. v Joseph*, 39 Misc3d 1220(A)] (Civ Ct Bronx County [2013])

27. The above cited decision, are in addition to Judge Avery, daily presiding in courtrooms and hearing cases in contentious litigation often in excess of tens of hundred cases calandared on the particular day.

**RETALIATION**

28. Plaintiff repeats, reiterates and realleges all the facts as stated above as if fully set forth herein and below.

29. In October of 2012, while in Riverhead, New York, attending a court sponsored seminar for Civil and Housing Court Judges, the plaintiff was the victim of three (3) incidents of sexual harassment by a senior judicial colleague.

30. As a result, the plaintiff filed a complaint against the offending Judge for the harassments.

12

31. The harassments were witnessed by at least six (6) other male judges.

32. The harassments were witnessed by at least six (6) other male judges included, the harassor shouting out loud, across the table where plaintiff was sitting for dinner with judicial colleagues, "let's all feel Avery up" and when plaintiff was retrieving an item she dropped on the floor, this same judge simulated plaintiff performing oral sex on the harassing Judge.

33. The results of the investigation, as reported by the Department of Investigation, was that my complaint was "unsubstantiated." The defendant's failed to properly investigate plaintiff's claims and thereby violated their public duty of office and plaintiff's rights as above and below demonstrated.

34. This is not atypical of the Unified Court System, (see, https://www.timesunion.com/news/article/State-s-top-judicial-officials-accused-of-13163900.php "Judicial officials covered up sexual harassment.... female attorney who was demoted and later fired from her job as a law clerk after accusing an acting state Supreme Court justice of sexual harassment filed a federal lawsuit this week accusing New York's top judicial officials of ignoring her complaints and condoning 'a widespread culture of silence and retaliation.'"

35. Following the incident at Riverhead, the Judge (also male) that was my immediate supervisor in Bronx County, treated me unfairly, discriminatorily, disrespectfully and "dumped" on me.   This as well as conduct stated below, is intentional discrimination, malicious and egregious.

36. Incidents of the unfair, discriminatory, disrespectful and dumpy treatment include, that after the incident, the Bronx Housing Court Supervising Judge, approached a lawyer, that suffers with a disability, who previously appeared before plaintiff, and requested that he write a

13

letter of complaint against the plaintiff.

37. Noteworthy, is that a week or so after the the Bronx Housing Court Supervising Judge, **requested** that a lawyer write a letter of complaint against the plaintiff, a different attorney met with that same Bronx Housing Court Supervising Judge, to complain that a different Housing Court Judge, said in open Court, and on the record to the complaining attorney "are you really that stupid, stupid, stupid!"

38. Yet in response to being informed that a Judge under his supervision, said to an attorney, in open court and on the record "are you really that stupid, stupid, stupid!" the supervising Judge, did not request that a letter be written complaining of this Judge's less than judicious behavior, rather the Supervising Judge talked the lawyer out of writing a letter against that Housing Court Judge about the incident.

39. Additionally, that with no reason, the plaintiff's Bronx County Supervising Judge reassigned the principal court attorney, Robin Emmanuelli, Esq., who was assigned to plaintiff, to a different Housing Court Judge.   Ms. Emmanuelli and plaintiff worked well together and enjoyed so working together.   No other judge that did not request a reassignment had his or her court attorney reassigned from him or her.

40. Where the other Housing Court Judges (except for the one (1) judge assigned to a trial part) was assigned to warrant review approximately every other week, and no more than twice a month, plaintiff was assigned to warrant review mostly every other week and at least three times a month.   This is significant because, when assigned to warrant review, in addition to presiding over and disposing of the 60 to 90 or more cases on our daily calendars, Housing Court Judges were required to review piles of applications seeking the issuance of a warrant of eviction, PLUS,

the Judge is required to preside in her assigned courtroom, PLUS, preside in a specialized part called Part Y to review ex parte order to show cause applications (10s of 100s per day).

41. Further, when attempting to have a conversation with the Bronx County Supervising Judge, he routinely walked away from plaintiff, mid sentence.

42. Soon after the plaintiff filed the complaint of sexual harassment against her male colleague, the Deputy Chief Administrative Judge at that time seemingly suddenly turned on plaintiff and gave her bad references.

43. Plaintiff's request for a transfer went ignored for too long.

44. Plaintiff was ultimately transferred from Bronx County Housing Court to Kings County Housing Court.

45. Throughout plaintiff's assignment in Kings County, the unfair, discriminatory, disrespectful, dumping and retaliatory, treatment continued.

46. In Kings County, plaintiff was initially assigned to a part which she was told by judicial colleagues, that she is "inheriting a part that is a mess" as a result of the mess that the Judge that immediately previously presided in that part created.

47. In that initial assignment in Kings County, plaintiff was assigned a Court Attorney that was so ineffective at the performance of her responsibilities that she was ultimately fired by Court Administration.

48. Throughout plaintiff's assignment in Kings County, assigned to plaintiff was a Court Clerk, that was most difficult to work with.   In fact, when plaintiff met with her Supervising Judge to discuss the difficulties with this Court Clerk, plaintiff was told by her then, Supervising Judge "that wherever he works he creates a **toxic** environment."

15

49. Further, in Kings County, during her assignment in a trial part, plaintiff was more often, than other Housing Court Judges, reassigned, and transferred from the part in which she was assigned to preside, and required to cover in parts where the Judges assigned to those parts had called in sick, or were otherwise out or on vacation.

50. Also, when assigned in Kings County, on an occasion, at the end of the day, where no less than eight (8) judges were present, one (1) judge when discussing her day, analogized the responsibilities of a Housing Court Judge to raping a self represented litigant.   Plaintiff took issue with the analogy and spoke up.

51. A day or so later, plaintiff was informed by her Supervising Judge that she, as well as the Deputy Chief Administrative Judge agreed with plaintiff's position, that her handling of the remark, was appropriate given the inappropriateness and horrific nature of the analogy.

52. Yet the Judge that made the inappropriate comparison, who was initially appointed to the Housing Court Bench the same year as plaintiff, was reappointed, and respondent, Marks, stated in his June letter of non-reappointment, that he relied on plaintiff's Supervising Judges when making his determination.

53. Additional dumping that plaintiff was subject to when assigned to Kings County Housing Court, includes the below.

54. After plaintiff was rotated out of her trial part assignment, where she was daily reassigned more often to cover in resolution parts where the judge assigned to that resolution part was unavailable than other Judges assigned to trial parts, the plaintiff was approached by her then Supervising Judge with a file, which was nearly a foot and a half thick.

55. It is worth noting that the self-represented litigant (tenant) in that case, was described

16

to the plaintiff by the Chief Clerk of Court, Kings County, as "the most difficult litigant I have ever had to deal with."

55. Plaintiff's then Supervising Judge said to her "I am returning this file to you because there are a number of motions that were not decided.

56. Plaintiff, then immediately, informed the Supervising Judge that, that was not the case, and that she issued decisions on all motions and submissions, that were previously pending and submitted fr determination.

57. The supervising Judge handed plaintiff the oversized file and said "show me."

58. Plaintiff took the file, and showed her Supervising Judge that all pending matters that were previously submitted before her, were, in fact, decided (apparently the clerk failed to enter the disposition into the computer).

59. In response, the plaintiff's then Supervising Judge stated, "good, so you are obviously very familiar with the issues in this case, so you keep it and do the trial."

60. Noteworthy, is that in this case, which involved a litigant which was described to the plaintiff by the Chief Clerk of Court, Kings County, as "the most difficult litigant I have ever had to deal with" and as the "the most difficult litigant" is an individual who suffers with a disability and is raising a child with a disability. Even more noteworthy, as stated below, is that, this litigant wrote a letter in support of plaintiff and plaintiff's reappointment to the Housing Court Bench. Her letter was addressed to defendants DiFiore, Marks, as well as others.

61. It is also noteworthy that, when this "oversized" file involving a "most difficult self represented litigant" was dumped on plaintiff, plaintiff was assigned to preside in a Housing Court part, where often in excess of 100 cases appeared on it's daily calendars in the morning

17

and in the afternoons, at least two (2) trials were scheduled to be heard.

62. The trial should have been conducted in the part that it was initially assigned to, pawning it off on plaintiff was pure "dumping."

63. Notwithstanding that at that time, the plaintiff was presiding in a part where often in excess of 100 cases appeared on it's daily calendars in the morning and in the afternoons, at least two (2) trials were scheduled to be heard, plaintiff heard full testimony in the trial involving a litigant that the Chief Clerk of Court, Kings County, referred to the  "the most difficult litigant I have ever had to deal with" plaintiff conducted the hearing to conclusion, issued a multi page, fact based and legally based decision, which was published (*2 Perlman Dr., LLC v Stevens*, 54 Misc3d 1215(A) (Civ Ct Kings County [Avery, J., 2017]), respondent Marks, generically cites to plaintiff's performance, competency and results achieved during the preceding term and fails to acknowledge plaintiff's hard work.

64. Also, worth noting is that this self represented litigant, that was described to the plaintiff by the Chief Clerk of Court, Kings County, as "the most difficult litigant I have ever had to deal with" wrote letters of praise, commending plaintiff's judicial temperament, plaintiff's sensitivity towards her special needs and the special circumstances of her family and a sensitivity of her understanding of her unique lot in life, which were addressed to Judge Marks, Judge DiFiore, and to whom it may concern (same is attached).

65. Erroneously, this was not positively considered by defendants in evaluating plaintiff's application.

66. When supervised by the Kings County Supervising Judge, occasionally, after plaintiff was approved for "leave" for medical purposes, annual leave, or other personal circumstances,

18

plaintiff's schedule changed, and as a result she was available to be present at her scheduled court assignment.

67. However, when plaintiff informed the Kings County Supervising Judge, that her plans changed or the appointments had been rescheduled, plaintiff was informed by the Kings County Supervising Judge, that she should not show up to work on those days, because she "put in for the time" and she "must take the time" "it was a matter of court operations."

68. It is outrageous, that in an office, in a court, where Chief Judge Janet DiFiore, published that the Special Commission on the Future of the New York City Housing Court stated that "[t]he New York City Housing Court.... is one of the busiest and most overburdened courts in the nation.... and that "[t]he pressing need for more judges... was among the most common complaints we heard. The current number of 50 Housing Court judges across all boroughs is grossly inadequate..." (see, http://ww2.nycourts.gov/sites/default/files/document/files/2018-06/housingreport2018_0.pdf), is told not to show up for work.

69. Yet, when a previously unavailable Judge, has a change of plans and becomes available, she is told not to bother to come to work, this is wrong, and plaintiff/petitioner knows of any other employer with such a policy.

**CONFIDENTIALITY VIOLATION**

70. Further evidence of discrimination and unfair treatment, is that defendants made available to be published results of proceedings which plaintiff was entitled to confidentiality and defendants were obligated to protect that confidentiality.

71. Further, illustrative, is that in the entire nearly 50 year history of the Housing Court,

19

respondent's have never caused to be published the confidential proceedings of a Housing Court Judge application for reappointment.   Yet the defendants' caused plaintiff's confidential information and proceedings to be leaked and published in the press, in an effort to hurt and humiliate the plaintiff.   Shame on them!   Public disclosure of privacy, is actionable, plaintiff has been damaged, inter alia, including her good reputation.

72. The defendants' caused the publication of this information in retaliation of the above stated, as well as below stated.   Defendants' purposefully and vindictively, and in disregard to standards of fair play, and for the purpose of causing plaintiff embarrassment, loss of reputation, permanent physical and emotional damage to plaintiff, which did cause plaintiff embarrassment, loss of reputation, permanent physical and emotional damage for which defendants are responsible for in a monetary amount to be determined.

73. Defendants, were privy to leaked information, which consisted of exaggerated and alleged facts, and they were obligated to plaintiff/petitioner, to keep same confidential, yet they failed their obligation, with purposeful and conspiratorial intent, to hurt the plaintiff/petitioner, which in fact, hurt petitioner, in a sum to be determined by this court and with the assistance of a reasonable jury, in a sum not less than stated below.

## HOSTILE WORK ENVIRONMENT

74. Based upon the foregoing, and the below mentioned, it is clear that the plaintiff was subject to a hostile work environment.

75. To state a hostile work environment claim under the NYCHRL, plaintiff must demonstrate that she has been treated less well than other employees because of a complaint she filed, as well as "her disability" see generally, *Williams v New York City Haus. Auth.*, 61 AD3d

20

62 (1st Dept [2009]).

76. "In determining whether a plaintiff was subject to a hostile work environment under the NYSHRL, the court must look at the totality of the circumstances and may consider 'the frequency of the discriminatory conduct; its severity; whether it is ...  humiliating..." *see generally, Forrest v Jewish Guild,* 3 NY3d 295 ([2004]).

77. The Court system's hiring practices are grossly inadequate to protect the rights of similarly situated individuals, as the plaintiff.

## FURTHER EVIDENCE OF HOSTILITY AND DISCRIMINATION

78. In the year 2011, plaintiff was appointed to the Housing Court Bench.   In that year, three (3) other individuals were also appointed to the Housing Court Bench.   Yet, when scheduling interviews for reappointment, notwithstanding that plaintiff's last name begins with the letter "A" defendant's did not contact plaintiff to schedule an interview until nearly six (6) months after her term expired, whereas, the other three (3) Housing Court Judges that were appointed in 2011 the same year that the plaintiff was appointed, had completed their interviews for reappointment by the time plaintiff was first contacted for her initial interview.

79. It is asserted that the defendants delayed scheduling plaintiff's interview process, in the hopes that the plaintiff would do or not do something in her official capacity that defendants could use against her, as it was defendants' intention, even prior to the reappointment process not to reappoint her.

80. In further, support, of the above, plaintiff last interviewed with the defendants in June of 2017, yet the respondent, Housing Court Advisory Council, waited more than five (5) months to issue their negative decision, in the hopes that the plaintiff would do or not do something in

her official capacity that defendants could use against her to "substantiate" their recommendation of her removal from her position.

81. The defendant, HCAC in its' first supplemental request for written responses to plaintiff, subsequent to her interviews with defendant, requested numerous documents and information relating to plaintiff's contested 2016 campaign for election to Civil Court. This is improper, egregious, and violates plaintiff's constitutional rights, including her first amendment rights.

82. The defendant, HCAC in its' second supplemental request for written responses to plaintiff, subsequent to her interviews with defendant, requested numerous documents and information relating to plaintiff's contested 2016 campaign for election to Civil Court (see attached).

83. This is improper, egregious, and violates plaintiff's constitutional rights, including her first amendment rights.

84. Defendants engaged in a fishing expedition, grasping for information to hurt plaintiff.

85. There were no specific cases cited to support that plaintiff did not live up to her ethical obligations as a Housing Court Judge.

86. No specific cases were cited to support that plaintiff, when presiding in the "HP Part" "gave excessive adjournments."   And there is nothing in the record to support that adjournments provided were any different than, when any other Judge, that sailed through the reappointment process were provided.

87. But for the Bronx incident, plaintiff was NEVER informed of any criticisms of her job performance by her supervisors or others, either before or after.

88. During the reappointment process, with no rhyme or reason, plaintiff was transferred from **Kings County** Housing Court to **New York County** Housing Court, most likely to scrutinize her in order to find fault.

89. Fault finding did not happen, rather, plaintiff was commended every step of the way, which is demonstrated by letters of support, for plaintiff's continuation at her position, which were submitted by lawyers and a litigant.

90. These letters were wholly ignored and disregarded by defendants.

91. The Court, and any employer, especially a government employer, *a fortiori*, should be in the business of constructing people rather than de-constructing individuals. Shame, shame shame on them!

## CONVERSION OF PROPERTY

92. Upon handing plaintiff the letter stating that defendant Marks would not reappoint her, Schneider told plaintiff, not to worry about relocating her belongings that were in her chambers, offices and courtroom.   Plaintiff was informed by Schneider that when plaintiff is ready she should call Schneider and arrange to the transfer of her items.

93. Soon after plaintiff was separated from service, plaintiff attempted to contact Schneider, by telephone call in an attempt to schedule plaintiff moving her belongings.

94. Plaintiff called Schneider and left a message informing Schneider that plaintiff sought to coordinate a move of her belongings from the courthouse.

95. Schneider did not return plaintiffs call.

96. Plaintiff then contacted administrative services and was informed that her items were "packed up" because another Judge needed to be moved in to her former space.

23

97. Upon learning that "another Judge needed to be moved in to her former space" Schneider nor anyone else, even attempted to contact the plaintiff, to let her know that her items would be "packed up" by "unknowns" or give plaintiff an opportunity to box her belongings, (or not) n her own.

98. Plaintiff's possessions, personal and professional, were sifted through, and thrown in boxes without covers and left open for all to see, notwithstanding that plaintiff was told that she could arrange to do this packing herself, and time was not a factor.

99. Following plaintiff's ultimate retrieval of her personal and professional items, she noticed that many items that belonged to her that she anticipated that she would pack herself and remove herself, as she was promised, were not in the boxes that were retrieved.

100. The above actions, are tantamount to a warrant-less search and seizure, run afoul of plaintiff's constitutional, state and common law rights to privacy and are contrary to the assurances that plaintiff was given.   Indeed, government employs have expectations of privacy in their government offices, desks, computers, and filing cabinets, see *O'Connor v Ortega*, 480 US 709 ([1987]); see also *McGregor v Greer*, 748 FSupp 881 (D.D.C. [1990]).

101. The items and loss, and damages thereon, will be determined and are in an amount that do not exceed the jurisdictional limit of this Court.

102. The amount of damages thereon representing the invasion of the plaintiff's privacy, will be determined, and are in an amount that do not exceed the jurisdictional limit of this Court.

103. Based upon the foregoing, it is clear that the plaintiff, at the hands of the defendants, because she exercised her first amendment rights and because she exercised her whistle-blower rights, was unfairly treated and targeted by defendants, in violation of federal, state and local

24

laws and the decision to not reappoint her not supported by "substantial evidence"which a

reasonable person would accept as enough to support the decision.

### ADDITIONAL VIOLATIONS OF PLAINTIFF'S RIGHTS

104. The Human Rights Law (Administrative Code §8-107[1]) provides that "[i]t shall be

an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof,

because of the actual or perceived . . . marital status . . (2) To refuse to hire or employ or to bar or

to discharge from employment such person or (3) To discriminate against such person in

compensation or in terms, conditions or privileges of employment."

105. In the case at bar, during her reappointment interviews with defendants, plaintiff was

questioned about specific face book posts, which defendants deemed inappropriate, which

defendants attributed plaintiff's husband, life partner, co-habitator and the like.

106. While it is not any business of the defendants (this Honorable Court, or the public)

the nature of the relationship between the plaintiff and the alleged author of the deemed

objectionable posts, it is clear that the defendants deemed that the author of the objectionable

posts was the life partner and husband of the plaintiff, it is clear that the defendants

unlawfully discriminated against plaintiff because of her "actual or perceived marital status" and

"refused to employ" plaintiff as a result of said perception.

### ADDITIONAL DUE PROCESS VIOLATIONS

107. The Civil Service Law(see §75) sets forth the procedures under which government

employees, may be removed or subjected to other disciplinary action for misconduct or

incompetency.   In pertinent part, the Civil Service Law §75 (1) provides, that a governmental

employee including "[a] person [holding a position by] .... appointment shall not be removed or

otherwise subjected to any disciplinary penalty.... except for incompetency or misconduct shown after a hearing upon stated charges pursuant to this section."

108. Defendants' failed to comply with this lawful provision as it applies to plaintiff.

109. As a result, the defendants are liable to plaintiff in an amount to be determined by a jury, which does not exceed the jurisdictional limit of this Honorable Court.

110. Further, no specific facts were provided to the plaintiff by defendants to support defendants determination.   Rather, general statements were made, which failed to provide plaintiff with meaningful notice and an opportunity to defend.

111. Indeed, see, for example, *Mathews v Eldridge*, 424 US 319 ([1976]) "[t]he essence of due process is the requirement that 'a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it.'"

## ADDITIONAL EGREGIOUS CONDUCT

112. Plaintiff, entrusted certain personal items (documents) including files, looseleaf books containing personal and professional information, letters of support, work products and lists of qualifications, which the named defendants agreed to return to plaintiff on demand.

113. When plaintiff appeared to retrieve said items, defendants, willfully, wrongfully and maliciously, refused to return said items upon plaintiff's initial and subsequent requests, notwithstanding their obligation to do so.

114. It was only after repeated attempts and personal demands by plaintiff for the return of said items that ultimately plaintiff's items were returned to her.

## ATTORNEY'S FEES COSTS, DISBURSEMENTS FEES AND ALLOWANCES

115. The laws of this state (CPLR §8601) provided that "[i]n addition to costs,

disbursements and additional allowances... a court shall award to a prevailing party, other than

the state, fees and other expenses incurred by such party in any civil action brought against the

state, unless the court finds that the position of the state was substantially justified or that special

circumstances make an award unjust.

116. As the position of the defendants (including but not limited to it's determination not

to reappoint plaintiff, and warrantlessy searching and seizing plaintiff's belongings) the

defendants were not substantially justified plaintiff is entitled to attorneys fees, costs

disbursements, interest, back pay, prospective pay, allowances, an apology, a retraction .

## BREACH OF DUTY OF OFFICE

117. Contrary to their legislative mandate, defendants failed to properly investigate the

plaintiff's complaints of sexual harassment.

118. Contrary to their legislative mandate, defendants failed to properly investigate the

plaintiff's complaints of sexual harassment on their own accord or at the request of others

including supervisors.

119. As a result the defendants are liable to plaintiff in a sum to be determined by a jury

in an amount that does not exceed the jurisdictional limits of this Honorable Court. #MeToo.

## FAILURE TO CONSIDER PLAINTIFF'S ALLEGATIONS

120. Based upon the facts herein asserted, it is clear that the defendants' failed to consider

the plaintiff's retaliation, discrimination, harassment and *inter alia* whistle blower assertions, see

*Matter of Cruz v Annucci*, 152 AD3d 1100 (3rd Dept [2017]) and decisions cited therein.

121. Indeed, "[s]ince the petitioner did not receive the procedural protections pursuant to .

. . the Supreme Court properly remitted the matter . . . for further proceedings . . ." *Matter of*

*Sanders v Board of Educ. of City School Dist. of City of N.Y.*, 17 AD3d 682 (2nd Dept [2015]).

122. As a result the defendants are liable to plaintiff in a sum to be determined by a jury in an amount that does not exceed the jurisdictional limits of this Honorable Court.

## PUNITIVE DAMAGES

123. Punitive damages are appropriate here.

124. The standard for punitive damages as found in, *inter alia*, title VII, as found in the NYCHRL includes whether plaintiff had submitted evidence that her (former) employer had intentionally discriminated against, in violation of Federal, State and Local laws, and so discriminated against her with malice and/or reckless indifference to her protected rights, see also Federal Whistle Blower Act, Medical Leave Act (29 USC §2601), the New York State Human Rights Law (Executive Law §296 [1] [a]), and the New York City Human Rights Law (Administrative Code of City of NY §8-107 [1] [a]) (NYCHRL); their Federal Counterparts; see also *Chauca v Abraham*, 30 NY3d 325 ([2017]).

125. Indeed, "a plaintiff is entitled to punitive damages where the wrongdoer's actions amount to willful or wanton negligence, or recklessness, or where there is 'a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard'" (*see Home Ins. Co. v American Home Prods. Corp.*, 75 NY2d 196 ([1990]) [internal quotation marks omitted]); see also *2460 Davidson Realty, LLP v Lopez*, 43 Misc3d 130(A) Sup Ct NY County [2014]).

126. Defendants failed to provide a reasonable accommodation to plaintiff and repeatedly scheduled and rescheduled appointments and interviews notwithstanding plaintiff's documented medical leave which was supplied to defendants see generally *Pimentel*, 29 AD3d 141, *lv denied* 7 NY3d 707 ([2006]) and *A. Anonymous v Mount Sinai Hosp.*, 2018 NY Slip Op 06212 — Misc

2016.

133. As stated, defendant Marks' letter informing plaintiff that he "decided" not to reappoint her to the Housing Court Bench was hand delivered to the plaintiff by the Housing Court Supervising Judge.

134. Prior to that time, and after the HCAC issued its "politically motivated" determination on plaintiff's application for reappointment, the Housing Court Supervising Judge, informed the plaintiff, had stated to plaintiff, that when her term is over, "it won't be a problem" and they "will find a position for her for in the court system for an additional year and a half" as the plaintiff, had eighteen (18) years in the system, and needed only another year and a half in the "court system" for retirement purposes.

135. At the time when the Housing Court Supervising Judge delivered Marks' letter to plaintiff, she informed plaintiff, that there was no position for her.

136. The Housing Court Supervising Judge also informed plaintiff that she should not worry because, when Mayor De Blasio initially ran for City Council in 2001, her husband (Steven Banks) ran in a primary election, against him for the seat.   Mayor De Blasio won that race.   And yet after years of bad blood, between the two (2) in 2014, Mayor De Blasio named him (Steven Banks) as the Commissioner of the Human Resources Administration.   She was clearly trying to comfort plaintiff into believing that the "political hit" against plaintiff, for asserting her rights including, *inter alia*, her first amendment rights and rights to whistle blow, has a shelf life.

137. Accordingly, defendant Marks did not base his decision on plaintiff's reappointment application on her "performance, competency and results achieved during the preceding term" as

30

he was statutorily required to do, rather his decision was a political hit, in violation of his oath of office, his responsibility to the public, the public trust that attached to his position, a strategic political power grab, and he does not deserve to hold the office that he holds.

## CONSPIRACY

138. In violation of the public trust bestowed upon the defendants, defendants, conversed and agreed and conspired with each other and others, to violate plaintiff's constitutional, civil, public rights, and rights in general as herein-above and herein-below stated, which caused damage to plaintiff, in an amount to be determined but not less than that stated below.

## JURISDICTION/VENUE

139. Venue is proper as the plaintiff resides within the territorial jurisdiction of this Honorable Court.

140. Jurisdiction and Venue are proper in this Honorable Federal Court, as, if plaintiff commenced this action in state court, she would not be afforded a fair trial, as state trial judges, are employed under the supervision, pleasure and authority of defendants DiFiore and Marks, and defendant Marks has already demonstrated his bias towards the plaintiff.

141. Venue is proper in this Honorable Federal Court, as defendants maintain a place of business, and or routinely visit this County for business purposes.

142. Jurisdiction is proper in this Honorable Court, as the wrongs herein committed violate, the laws guaranteed to the plaintiff, including, *inter alia*, plaintiff's Federal Constitutional and statutory rights.

143. The prerequisite notice of claim was served, which provided advanced notice, prior to the commencement of the instant action..

31

**NO PRIOR APPLICATION**

144. The plaintiff has not made a previous request for the relief herein requested to this court.

**ANNEXATIONS**

144. The documents, if any, annexed hereto are true and accurate copies of what they purport to be, based upon plaintiff's personal knowledge.

**RESERVATION OF RIGHTS**

145. Plaintiff reserves her rights to supplement and amend the allegations and statements made herein, and supply and file further documents including but not limited to those referenced herein.   Plaintiff did not file a charge or charges against the defendant(s) with the EEOC or any other government agency.

**ALLEGATIONS**

146. Plaintiff repeats, reiterates and realleges all the facts and allegations, as stated above as if fully set forth herein and below and as if realleged and reiterated in every paragraph, throughout this complaint.

**PLAINTIFF'S CERTIFICATION AND WARNINGS**

147. By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise

complies with the requirements of Federal Rule of Civil Procedure 11.

148. Plaintiff agrees to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

## JURY DEMAND

149. Demand is hereby made for a trial by Jury.

## CONCLUSION

WHEREFORE, the plaintiff requests that this court issue an order and judgment declaring that the plaintiff should have been reappointed to the Housing Court Bench, that the decision not to reappoint plaintiff to the Housing Court Bench was issued in violation of the laws, including, *inter alia*, but not limited to the Civil Court Act, the Federal and State Constitutions, whistle blower legislation, defendants' oaths of offices, privacy rights, rights against sexual harassment in the work place, rights to privacy, defamation to character, and placing the matter on the calendar for a trial before a jury to determine damages caused to plaintiff based upon, inter alia, the details above in addition to back pay and prospective pay and out of pocket expenses to the plaintiff as a result of the above, in an amount not less than $5,000,000.00 (five million) dollars, exclusive of costs, assessments and punitive damages.

Further, on review of the entire record, demonstrates that is not supported by substantial evidence and was made with a total failure of the issuing entity to follow the law and in excess of the issuing entity's jurisdiction, the above stated actions and inactions are contrary to law, they violate the plaintiff's right to fairness and justice, including reasonable attorney fees and costs

33

and interest disbursements, an award of damages, including punitive actual and consequential

damages, allotments plus interests, plus all other relief as herein above requested and that

plaintiff shall have judgment therfore.

Dated: October 5, 2018

Respectfully Submitted
Susan Avery
332 East 84 Street, 6B
New York, NY 10028
212 988 6651

34